# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 23-1541V**

|  |
|---|
| ELIZABETH STARKEY |
| Petitioner, |
| v. |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |
| Respondent. |

Chief Special Master Corcoran

Filed: June 5, 2026

*David John Carney, Green & Schafle LLC, Philadelphia, PA, for Petitioner.*

*Julianna Rose Kober, U.S. Department of Justice, Washington, DC, for Respondent.*

## FINDINGS OF FACT AND RULING ON ENTITLEMENT[1]

On September 6, 2023, Elizabeth Starkey filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA") following an influenza ("flu") vaccine she received on October 17, 2021. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons set forth below, I find that Petitioner more likely than not suffered the residual effects of her alleged vaccine-related injury for more than six months, and

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

that she has satisfied all of the requirements of a Table SIRVA claim. Therefore, Petitioner is entitled to compensation under the Vaccine Act.

## I.    Relevant Procedural History

The parties briefly engaged in settlement discussions in 2024, but fairly quickly reached an impasse. *See* ECF No. 14-19. Respondent then filed his Rule 4(c) Report on August 12, 2024, in which he argued that Petitioner could not satisfy the statutory severity requirement nor the Table elements of a SIRVA claim. ECF No. 20.

Petitioner filed a Motion for Ruling on the Record ("Mot.") on October 11, 2024. ECF No. 22. Respondent filed a response ("Resp.") on December 9, 2024 and Petitioner filed a reply ("Repl.") on April 29, 2025. ECF No. 23, 26. The matter is now ripe for adjudication.

## II.    Relevant Facts

### a.  *Medical Records*

Petitioner received a flu vaccine in her left arm on October 17, 2021. Ex. 1 at 16. She requested medication refills via "web encounter" in the following two months - on November 11, November 16, and December 13, 2021. Ex. 3 at 22-24. These records do not document shoulder pain.

Petitioner saw her primary care provider ("PCP") on December 20, 2021 (64 days after vaccination). Ex. 3 at 20. She now reported that she had experienced "significant pain" in her shoulder since a vaccination on October 17th. *Id*. She noted that the "shot itself was painful." *Id*. She had limited range of motion, especially above 90 degrees. *Id*. at 21. She was prescribed prednisone and given a home exercise program. *Id*. at 20. An x-ray on December 28, 2021 was normal. Ex. 4 at 5. She was prescribed a second course of prednisone on December 29, 2021. Ex. 3 at 19.

On January 18, 2022, Petitioner sent a message to her PCP about her ongoing pain. Ex. 3 at 16. She reported "no improvement," and stated that "the pain continues between [the] shoulder and elbow, but sometimes travels all the way to [the] fingertips." *Id*. She explained that she had researched SIRVA and noted that her pain "started from the very onset of the injection." *Id*.

Petitioner saw her PCP the following day for an acute eye condition. Ex. 3 at 10. That day, the doctor also ordered an MRI of Petitioner's shoulder. *Id*. at 13-14. When Petitioner questioned whether the MRI should cover her entire arm because "the pain [was] between the shoulder and an elbow," the doctor replied that the MRI was intended for "the area where the injection was placed." *Id*. at 12. The MRI revealed mild

2

tendinopathy, a small joint effusion, and a "greater than expected quantity of fluid in the subacromial bursa." Ex. 4 at 3. Petitioner was referred to an orthopedist. Ex. 3 at 9.

Petitioner saw an orthopedist on February 24, 2022. Ex. 5 at 5. She reported left shoulder pain that "started in October 2021 after she received the flu vaccine." *Id*. She stated that she would experience pain "at extremes of motion" and "occasional numbness into the left hand." *Id*. On exam, forward flexion, external rotation, and internal rotation were significantly reduced. *Id*. at 7. But both wrists and elbows had "full ROM without pain." *Id*. Petitioner was diagnosed with adhesive capsulitis and advised that "this may take more than a year to run its course." *Id*. at 8. She was given a cortisone injection and provided a home exercise program to perform daily. *Id*. She was advised that her "range of motion will gradually improve over the next 6-18 months," and that repeat injections were available, but that she "must wait at least 3 months." *Id*. She was instructed to "follow up as needed if symptoms increase." *Id*.

Petitioner returned to the orthopedist almost a year later, on January 17, 2023. Ex. 6 at 4. The record noted that her left shoulder pain "started about 1 year ago following a flu shot." *Id*. at 5. The doctor recalled that at her last appointment she "had significant adhesive capsulitis." *Id.* Petitioner reported that the injection had helped partially and that her "pain is now nearly gone, but she still has some decreased motion with forward flexion." *Id*. On exam, she had nearly full external and internal rotation, but "lack[ed] 30 degrees from full flexion." *Id*. at 6. She was again assessed with adhesive capsulitis. *Id*. at 7. She was advised to continue her daily exercises, although physical therapy was recommended, with range of motion expected to gradually improve "over the next 6-12 months." *Id.* She was advised to "follow up as needed if symptoms increase," at which time "another cortisone injection could be considered." *Id*.

No further treatment records were filed.

b. *Affidavit Testimony*

Petitioner filed an affidavit with the Petition. Ex. 2. She recalled that "after the vaccine, [she] began to feel an unusual amount of pain in [her] left arm," but that she "did not consider [her symptoms] to be abnormal at first, as it is to be expected to have some soreness after receiving a vaccine." *Id*. at ¶10. Once her symptoms persisted, she sought medical treatment. *Id*. at ¶11.

Petitioner recalled her orthopedist informing her that "it could take up to two years to recover" and that the only available treatment was a cortisone injection and home exercises. Ex. 2 at ¶12. She recalled that the doctor advised her to "give a few months to see if the injection brought [her] any relief, and return if [she] through [her] shoulder was not improving in a few months." *Id*. She stated that she "followed the home-exercise program consistently" and that she "was expecting the pain to go away." *Id*.

3

Petitioner stated that she still had "lingering pain and difficulty performing some daily activities," and decided to return to her orthopedist "to see if he could recommend any further treatment. Ex. 2 at ¶13. She recalled the only options as physical therapy and a repeat cortisone injection. *Id*. She declined the repeat injection because "the first one had only helped for about two weeks, and [she] was afraid about another injection aggravating [her shoulder." *Id*. She stated that she was unable to pursue physical therapy due to the cost and distance "to the nearest facility." *Id.*

### III.    Applicable Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove by a preponderance of the evidence the matters required in the petition by Vaccine Act Section 11(c)(1). The Vaccine Act also requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Vaccine Act §11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. §13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

4

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

In addition to requirements concerning severity of petitioner's injury, a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he received. Section 11(c)(1)(C). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to

5

occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (*e.g.* tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

6

### IV.    Findings of Fact

#### A.  *Severity*

Respondent argues that Petitioner has not satisfied the statutory severity requirement because "the current record . . . establishes pain only through February 24, 2022 – four months after vaccination." Resp. at 7. Respondent further argues that Petitioner's "vast" gap in treatment – about 11 months – defeats her claim because "there is no evidence in the record that her symptoms were connected to her alleged injury from one year prior" and because she received no shoulder treatment thereafter. *Id*. at 8-9.

As Petitioner has alleged immediate onset after vaccination, she must demonstrate that her symptoms more likely than not continued until at least April 17, 2022 – six months after vaccination. The record establishes that Petitioner treated her shoulder pain, with two PCP visits, one x-ray, one MRI, one orthopedist visit, and one cortisone injection through February 24, 2022 – a period of just over four months – before the almost year gap. Therefore, the crucial question is whether Petitioner had ongoing symptoms between February 24, 2022 and April 17, 2022 – a period of seven weeks. The record supports the determination that she did.

During Petitioner's orthopedist appointment on February 24, 2022, Petitioner displayed substantially reduced range of motion – with forward flexion to 110 degrees, external rotation to 30 degrees, and internal rotation to only 20 degrees. Ex. 5 at 7. Her adhesive capsulitis on that date was described by the doctor as "significant." Ex. 6 at 5. She was given a cortisone injection and a home exercise program and advised that her recovery would be gradual "over the next 6-18 months." Ex. 5 at 8. In fact, the doctor informed her that she could not have another injection for "at least 3 months" and instructed her to follow up "as needed if symptoms increase," suggesting that if her symptoms remained the same or improved, there was no need to return. *Id.* Thus, the objective record suggests that Petitioner was expected by her specialist to continue to experience symptoms well beyond the next seven weeks.

After that appointment, Petitioner states that she experienced some initial relief from the injection and performed her home exercises "consistently, which did help [her] pain." Ex. 2 at ¶12. She recalled that the orthopedist told her that it could take up to two years for her condition to resolve and that the only available treatment was the injection and home exercises – and that she trusted his advice. *Id.* Petitioner's recollection is consistent with the record. Although the relief from the injection wore off, Petitioner stated that she "was expecting the pain to go away, and [she] wanted to see if [her] shoulder pain would improve as [she] approached the one-year mark of [her] vaccination." *Id.*

When her shoulder did not return to normal, she returned to the orthopedist "to see if he could recommend any further treatment." *Id.* at ¶13. The record of that later visit is consist shows consistent (although improved) symptoms. Ex. 6 at 5. Although her pain was minimal, Petitioner still had deficits in forward flexion, external rotation, internal rotation. *Id.* at 6. The doctor again advised that Petitioner's symptoms were "likely to gradually resolve" over a long period of time – an additional 6-12 months. *Id.* at 7. He referred her to physical therapy and offered another cortisone injection if her symptoms increased. *Id.* In contrast, there is no evidence in the record suggesting that Petitioner's shoulder pain had resolved by February 24, 2022 – and recurred due to another cause - as argued by Respondent.

Thus, the evidence preponderates in Petitioner's favor on this issue. However, the long gap in treatment, coupled with the limited nature of treatment, are important factors in determining any award for pain and suffering she may receive (and therefore Petitioner must be realistic about the fairest, and most likely, outcome for any damages award to be received in this matter).

B. *Table SIRVA Claim Elements*

1. <u>Prior Shoulder Symptoms/Other Condition Present</u>

Respondent argues that "it is unclear whether Petitioner had no history of pain, inflammation, or dysfunction of her left shoulder prior to October 17, 2021." Resp. at 13. Specifically, Respondent states that Petitioner's prior medical history includes unspecified joint swelling, stiffness, and muscle pain," and that her PCP noted that some of her MRI findings "can be from normal activities/repetitive actions, etc." *Id.* (citing Ex. 3 at 183, 189, 193).

The records cited by Respondent in support of prior shoulder pathology, however, do not note "unspecified" musculoskeletal issues, and do not address Petitioner's shoulder at all. Those records clearly address left knee pain, right ankle pain, and right knee pain, respectively. Ex 3 at 183, 189, 190.  Further, Respondent does not fully cite the assessment of the MRI results by Petitioner's PCP. Although the doctor did note that "some mild tendinitis of the rotator cuff muscles . . . can be from normal activities/repetitive actions etc.," she went on to state that the bursa also appeared "to have more fluid in it" which she wondered whether "if the vaccine was put into the bursa sac which would cause [Petitioner's] pain and would be in the right location [Petitioner] showed [her] where they injected the vaccine." Ex. 3 at 9.

8

As there is no other evidence in the record that Petitioner experienced pain or dysfunction in her left shoulder prior to vaccination and no other evidence in the record of another condition that would explain Petitioner's left shoulder symptoms, I find that the first and fourth QAI criteria have been met.

### 2.    Onset within 48 hours

Respondent argues that Petitioner has not established Table onset because "Petitioner contacted her PCP at least three times to request prescription refills without mentioning left shoulder pain" and then reported pain to that same doctor when she ultimately sought treatment. Resp. at 14. He further argues that her reporting of onset was "vague" and not clarified by her affidavit testimony. *Id*. Finally, Respondent states that although Petitioner stated to her doctor that she experienced immediate onset, that statement should be discounted because the statement was made after she had researched SIRVA injuries. *Id*.

A careful reading of the medical records provides support for Table onset. As Respondent noted, Petitioner requested refills of three prescriptions during the two-month period between her vaccination and her first appointment for shoulder pain. *See* Ex. 3 at 22-24. Each of those requests was through a "web encounter" and answered by a different person than the one that treated Petitioner for her shoulder pain. *Id*; *compare* Ex. 3 at 20. This type of internet-based prescription refill system was not an occasion to discuss or report new medical symptoms. Further, Petitioner stated that she expected some soreness after a vaccine, and "did not consider [her] symptoms to be abnormal at first." Ex. 2 at ¶10.

Respondent's argument also omits specific language in the record of Petitioner's first treatment, where she noted that the "shot itself was painful," clearly indicating immediate onset. Ex. 3 at 20. Petitioner reported immediate onset again a month later in a message to her doctor stating that "it started from the very onset of the injection." *Id*. at 16. The fact that Petitioner researched SIRVA injuries in an attempt to understand what might be afflicting her at the time does not undermine her statement. Further, even if Petitioner had contacted an attorney at the time and knew about the ability to make a claim, she had previously reported immediate onset to her doctor and had consistently linked the onset of her pain to her vaccination. *See* Ex. 3 at 16, 20-21; Ex. 5 at 5; Ex. 6 at 5.

Accordingly, I find there is preponderant evidence to establish the onset of Petitioner's pain occurred within 48 hours of vaccination.

9

### 3.    Injury Localized to Vaccinated Arm

Respondent finally argues that "Petitioner's alleged shoulder pain was not limited to the shoulder in which the intramuscular vaccine was administered, as required to establish a Table injury." Resp. at 15. Respondent bases this argument on three records in which Petitioner reported pain radiating to the back of her shoulder, pain between her shoulder and elbow, and "occasional numbness into the left hand." *Id*. (citing Ex. 3 at 12, 16, 20-21; Ex. 6 at 27).

Petitioner's medical records contain multiple references to her complaints about, and the treatment she received for, her left shoulder pain. Notably, there is no evidence in the record that Petitioner received any treatment outside of her left shoulder. In fact, when Petitioner asked her PCP whether the MRI should cover more than just her left shoulder, the doctor indicated that the shoulder needed to be the focus of the imaging. See Ex. 3 at 12. Further, Petitioner's orthopedist thoroughly examined both arms and found deficits only in the shoulder, specifically noting that both elbows and wrists were fully functional without pain. Ex. 5 at 7.

While I acknowledge the references cited by Respondent, they are outweighed by the evidence establishing that pain and decreased range of motion, as well as all treatment, were limited to the left shoulder. To satisfy the third QAI Table criterion, the relevant records need not be devoid of all reference to pain or other symptoms outside the affected shoulder, as a petitioner need only present preponderant evidence to prevail. *See Moberly ex. rel. Moberly v. Sec'y of Health & Human Servs,* 592 F.3d 1315, 1322 (Fed. Cir. 2010) (holding that the applicable level of proof is not certainty, but the traditional tort standard of "preponderant evidence"). I therefore find there is preponderant evidence to support a finding that Petitioner has satisfied the third QAI Table requirement for a SIRVA injury.

## V.    Ruling on Entitlement

### A.    *Requirements for Table SIRVA*

I have found that Petitioner has preponderantly established that her pain began within 48 hours, that her pain and reduced range of motion were limited to the vaccinated left shoulder, and that there is no evidence of prior shoulder pain or an alternative condition that would explain Petitioner's shoulder pain. 42 C.F.R. § 100.3(c)(10)(i)-(iv). Accordingly, I find that Petitioner has provided preponderant evidence to establish that she suffered a Table SIRVA injury.

B.    *Additional Requirements for Entitlement*

Because Petitioner has satisfied the requirements of a Table SIRVA, she need not prove causation. Section 11(c)(1)(C). However, she must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

The vaccine record shows that Petitioner received an influenza vaccine on October 17, 2021. Ex. 1 at 16; Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Additionally, Petitioner has stated that she has not filed any civil action or received any compensation for her vaccine-related injury, and there is no evidence to the contrary. Ex. 2 at ¶8; Section 11(c)(1)(E) (lack of prior civil award). And as noted above, I have found that severity has been established. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Therefore, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case. A separate damages order will be issued.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
